# In the United States Court of Federal Claims

No. 09-125C

(Filed Under Seal:  July 21, 2009)

Reissued:  August 10, 2009[1]

_____

| | |
|---|---|
| NEQ, LLC, | * |
| | *    Post-award bid protest; EPA contract for |
| Plaintiff, | *    emergency and rapid response services; |
| | *    Motion for judgment on the administrative |
| v. | *    record – nature of review – *Bannum*; |
| | *    Proper scope of the administrative record – |
| THE UNITED STATES, | *    *Axiom*; Unstated evaluation factor – |
| | *    metropolitan presence of emergency |
| Defendant, | *    responders; Subcontractor requirements; |
| | *    Adequacy of trade-off decision; Failure to |
| and | *    address other injunctive factors; Relief |
| | *    denied. |
| LATA-KEMRON REMEDIATION, LLC, | * |
| | * |
| Defendant-Intervenor. | * |

_____

## OPINION

_____

*William E. Hughes, III*, Whyte Hirschboeck Dudek, S.C., Milwaukee, WI, for plaintiff.

*Michael N. O'Connell, Jr.*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *Michael F. Hertz*, for defendant.

*Isaias Alba, IV*, PilieroMazza PLLC, Washington, D.C., for defendant-intervenor.

**ALLEGRA Judge:**

This post-award bid protest is before the court on the parties' cross-motions for judgment on the administrative record.  Plaintiff, NEQ, LLC, contends that in awarding a contract for

_____

[1]An unredacted version of this opinion was issued under seal on July 21, 2009.  The parties were given an opportunity to propose redactions, but no such proposals were made.

emergency and rapid response services (ERRS), the Environmental Protection Agency (EPA) relied upon an unstated evaluation factor and otherwise acted in an arbitrary and capricious fashion.  After careful consideration of the briefs and other materials filed by the parties, the oral argument, and for the reasons discussed below, the court **DENIES** plaintiff's motion for judgment on the administrative record and instead **GRANTS** defendant's and defendant-intervenor's cross-motions.

## I.     Background

On September 27, 2007, the EPA issued request for proposal PR-R5-07-10015, contemplating the award of an indefinite-delivery/indefinite-quantity, time and materials ERRS contract.  The contract was to have a three-year base period, with two potential option terms of two years each, for a maximum contract period of seven years.  The estimated value of the contract was approximately $105 million.  The RFP required the award to be made to the offeror proposing the best value to the government in accordance with the stated evaluation criteria.

The purpose of the contract, according to the Statement of Work (SOW), was "to provide fast responsive environmental cleanup services for hazardous substances/wastes/contaminants/ materials and petroleum products/oil for Region 5 (Illinois, Indiana, Ohio, Michigan, Wisconsin, and Minnesota)."  "[E]nvironmental cleanup response to natural disasters and terrorist activities," the SOW advised, might also be required under the contract.  The SOW contemplated three categories of response action, expressed with decreasing levels of urgency: (a) "emergency," which required immediate response; (b) "time-critical," which required a response within six months of notification; and (c) "non-time critical," which required a response greater than six months after notification.  In each instance, the contractor, in response to a task order for services, was to provide personnel and equipment for multiple tasks, including, "emergency response, sampling, monitoring, site stabilization, controlling spilled material, waste treatment, restoration, removal actions, transportation and disposal."

The SOW contained detailed requirements and performance standards for response services.  It emphasized the need for quick emergency response times to nine large metropolitan areas located within Region 5, specifying  –

> For emergency response actions requiring immediate mobilization to the site, the contractor will be required to be en route within two (2) hours and arrive at the site no later than four (4) hours for the metropolitan areas listed below.

> 1. Chicago
> 2. Detroit
> 3. Minneapolis
> 4. Cleveland
> 5. East St. Louis
> 6. Cincinnati
> 7. Milwaukee

        8.  Indianapolis
        9.  Columbus

"For non-metropolitan areas," the SOW further indicated, "the contractor will be required to be en route within (2) two hours and arrive at the site no later than (6) six hours."  The contractor was afforded eight hours to reach the Upper Peninsula of Michigan and Northern Minnesota.

The RFP listed four factors, each with several "significant" subfactors, that would guide the agency's evaluation, with respective point values assigned, as follows:

**Factor 1.    Corporate (40 Points)**

        Subfactor a.    Technical Management (10 points)
        Subfactor b.    Business Management (10 points)
        Subfactor c.    Personnel (10 points)
        Subfactor d.    Contract Management Ability (10 points)

**Factor 2.    Response Capabilities (30 Points)**

        Subfactor a.    Response Experience (10 points)
        Subfactor b.    Response Network (20 points)

**Factor 3.    Technical Ability (30 Points)**

        Subfactor a.    Pop Quiz (5 points)
        Subfactor b.    Time Critical Scenario (15 points)
        Subfactor c.    Emergency Response Scenario (10 points)

**Factor 4.    Past Performance (10 points)**

Regarding the relative weight of these factors, section M stated that "[f]or this solicitation, all evaluation factors other than cost or price when combined are more important than cost or price."

The RFP again reflected the importance of prompt response times in describing Factor 2, "Response Capabilities," requiring that "[t]he offeror shall demonstrate with a chart and map how and where response personnel, equipment and regional network of response personnel will be available, whether provided by the contractor or any subcontractor."  The offeror was also obliged to "demonstrate how response time limits required in the SOW will be met" and to include in its technical proposal "a location chart delineating the total number of personnel by locations, available for the contract."

Section M provided for a technical evaluation panel (TEP) to evaluate the various factors, using the following scale:

| Rating | Rating Criteria |
|--------|-----------------|
| 5 | The response to the factor is superior in most features. |
| 4 | The response to the factor is good with some superior features. Information provided is generally clear, and the approach is acceptable with the possibility of more than adequate performance. |
| 3 | The response to the factor is adequate.  Overall, it meets the specifications and requirements, such that the TEP believes that the offeror could perform to meet the Government's minimum requirements |
| 2 | Information related to the factor is incomplete, unclear, or indicates an inadequate approach to, or understanding of the factor.  The TEP believes that there is question as to whether the offeror would be able to perform satisfactorily. |
| 1 | The factor is addressed, but contains deficiencies and/or weaknesses that can be corrected only by major or significant changes to relevant portions of the proposal, or the factor is addressed so minimally or vaguely that there are widespread information gaps.  In addition, because of the deficiencies, weaknesses, and/or information gaps, serious concerns exist on the part of the Technical Advisory Panel (TEP) about the offeror's ability to perform the required work. |
| 0 | The factor is not addressed or is totally deficient and without merit. |

These ratings were to be converted to point scores using a sliding scale set forth in the RFP (*e.g.*, a TEP rating of 5 would lead to an award of 100 percent of the available points, 4 would lead to an award of 80 percent of the available points, 3 would lead to an award of 60 percent of the available points, *etc.*).

On October 29, 2007, EPA received three timely proposals from the following offerors: NEQ, a joint venture between NEIE, Inc. and Environmental Quality Management, Inc. (EQM); LATA-KEMRON Remediation (L-K), a joint venture between Los Alamos Technical Associates and KEMRON Environmental Services, Inc.; and LEEDI, a joint venture between Lee & Ryan and Environmental Design International.  On November 15-17, 2007, the TEP heard oral presentations from the offerors.  On April 24, 2008, the contracting officer requested a competitive range determination to revisit the major weaknesses of the offers.  Negotiations were held between May and July 2008.  Between July 2-7, 2008, EPA received final proposal revisions from the offerors.  On August 12, 2008, the TEP issued its final report.

On August 28, 2008, EPA issued a source selection document selecting L-K for the contract.  The technical scores reflected in this document were as follows:

| Evaluation Factors/Subfactors | Maximum Score | NEQ | L-K | LEEDI |
|---|---|---|---|---|
| **1. Corporate** | | | | |
| 1a. Technical Management | 10 | 8 | 8 | 6 |
| 1b  Business Management | 10 | 8 | 8 | 8 |
| 1c. Personnel | 10 | 8 | 8 | 8 |
| 1d. Contract Management | 10 | 8 | 8 | 10 |
| Factor 1 Total | 40 | 32 | 32 | 32 |
| **2. Response Capability** | | | | |
| 2a. Response Experience | 10 | 6 | 8 | 6 |
| 2b. Response Network | 20 | 12 | 16 | 12 |
| Factor 2 Total | 30 | 18 | 24 | 18 |
| **3. Technical Ability** | | | | |
| 3a. Pop Quiz | 5 | 3 | 4 | 3 |
| 3b. Time Critical | 15 | 12 | 9 | 12 |
| 3c.  Emergency Response | 10 | 6 | 4 | 4 |
| Factor 3 Total | 30 | 21 | 17 | 19 |
| **4. Past Performance** | | | | |
| Factor 4 Total | 10 | 8 | 8 | 8 |
| | | | | |
| Grand Total Scores | 110 | 79 | 81 | 77 |

As was anticipated by the RFP, the TEP focused heavily on the location of the contractors' personnel and their ability to respond to emergencies.  L-K's proposal was the most expensive, but the agency deemed its higher price "a reasonable tradeoff for the decentralized response network, realistic labor mix, and balanced personnel matrix."

On August 22, 2008, NEQ was advised that L-K had been selected for award.  On September 2, 2008, NEQ filed a protest with the Government Accountability Office (GAO).  It argued that the source selection document incorrectly inflated its price from $102,960,441 to $103,493,399 and had incorrectly stated that the RFP provided that all evaluation factors other than cost or price, when combined, were "significantly" more important than cost or price, despite the RFP not having used the quoted word.  By letter dated September 15, 2008, the GAO advised that it had "carefully reviewed" the issues raised in the protest and had "concluded that

corrective action [was] appropriate."  GAO dismissed NEQ's protest as moot, based on representations that the agency would undertake voluntary corrective action.  EPA issued a second source selection document on or about September 25, 2008, reflecting the two changes previously identified by NEQ.  Nonetheless, after reexamination, on October 23, 2008, the agency again awarded the contract to L-K.

On October 27, 2008, NEQ filed a second protest with the GAO, this time challenging the EPA's evaluation of the Response Network subfactor (2b).  Specifically, it complained that: (i) the source selection document improperly stated that L-K had speciality subcontractors "readily accessible," even though L-K had failed to provide letters of commitment from those subcontractors; and (ii) NEQ's use of two laborers for emergency response had been declared a weakness even though the RFP listed two laborers as being the minimally acceptable number. Once more, EPA agreed to take corrective action and the GAO dismissed the protest as moot.

On or about January 22, 2009, EPA released a third source selection document, in which it deleted the reference to NEQ's use of two laborers as being a weakness and replaced the statement that the speciality contractors were "readily accessible" with one that stated that L-K had "noted a working relationship" with its specialty contractors.  These changes did not result in any alteration of NEQ's score under subfactor 2b or overall.  L-K's technical evaluation remained the same, with the agency concluding, *inter alia*, that it had a greater presence than NEQ in seven of the nine metropolitan areas listed in the RFP.  Emphasizing the importance of the response network, the source selection document summarized the TEP's extensive analysis of the number and types of personnel that the three contractors had in the metropolitan areas identified in the RFP.  It summed up that analysis in the accompanying table:

| | Response Managers | Foremen | Equipment Operators | Laborers |
|---|---|---|---|---|
| **CHICAGO** | | | | |
| NEQ | 5 | NONE | 3 | 15 |
| LATA-KEMRON | 2 | 2 | 3 | 6 |
| LEEDI | 3 | NONE | 2 | 7 |
| **DETROIT** | | | | |
| NEQ | NONE | NONE | NONE | NONE |
| LATA-KEMRON | 1 | NONE | 2 | NONE |
| LEEDI | 1 | NONE | 1 | NONE |
| **MINNEAPOLIS** | | | | |
| NEQ | 3 | 2 | NONE | 4 |
| LATA-KEMRON | 7 | 6 | 2 | 33 |
| LEEDI | NONE | 1 | 1 | 1 |

| EAST ST. LOUIS | | | | |
|---|---|---|---|---|
| NEQ | NONE | NONE | NONE | NONE |
| LATA-KEMRON | 4 | 10 | 4 | 85 |
| LEEDI | NONE | NONE | NONE | NONE |
| CINCINNATI | | | | |
| NEQ | 34 | NONE | 23 | 57[2] |
| LATA-KEMRON | 6 | 3 | 6 | 33 |
| LEEDI | NONE | 2 | 3 | 12 |
| MILWAUKEE | | | | |
| NEQ | NONE | NONE | NONE | NONE |
| LATA-KEMRON | 1 | NONE | 2 | NONE |
| LEEDI | NONE | NONE | NONE | 1 |
| INDIANAPOLIS | | | | |
| NEQ | NONE | NONE | NONE | NONE |
| LATA-KEMRON | NONE | NONE | NONE | NONE |
| LEEDI | 3 | 2 | 1 | 10 |
| COLUMBUS, OH | | | | |
| NEQ | NONE | NONE | NONE | NONE |
| LATA-KEMRON | 7 | 10 | 18 | 18 |
| LEEDI | NONE | NONE | NONE | NONE |

The source selection document made a series of findings tied to this table. It found, for example, that "[t]he table reveals that NEQ has no direct presence in 6 of the 9 emergency response metro areas, LEEDI has no presence in 3 of the 9, and LATA-KEMRON has no presence in 2 of the 9," noting that "[t]he Agency would realize a significant benefit with potentially quicker response time in one Metro area by awarding to NEQ, one Metro area by

---

[2] There is indication that the TEP table considerably overstated the number of NEQ personnel in the Cincinnati metropolitan area. NEQ's proposal indicates that it had only 34 individuals in that area, rather than the 114 individuals the TEP listed on the chart.

awarting to LEEDI and three Metro areas if the contract is awarded to LATA-Kemron."[3]  It
further adumbrated:

> The panel has concluded that LATA-KEMRON has the most thoroughly
> identified team subcontractor network, and the highest level of direct presence
> overall in the nine emergency response metropolitan areas.  Having a thoroughly
> identified team subcontractor network and a higher level of direct presence in the
> emergency response metropolitan areas significantly benefits the EPA because
> response times are reduced.  Note that the SOW 4-hour arrival time requirement
> for these metropolitan areas is the LATEST permissible arrival time.  Earlier
> arrival times mean earlier start of cleanup actions and less impact on human
> health and the environment.  Another benefit to having personnel located within
> the metro area is significant[] savings on per diem expenses during a time critical
> response.  Time critical responses, unlike emergency responses, are planned, but
> have similar requirements.  For example, Region 5 has recently had several
> residential sites in Minneapolis, Detroit, and Chicago.  Labor availability in these
> areas would have resulted in significant cost savings to the Government because
> per diem costs of approximately $200.00 per day would have been avoided.

Finally, it added that "[t]he panel also feels that LATA-Kemron has proposed a more realistic
labor mix" – a reference, *inter alia,* to the mix between different types of supervisory, skilled and
unskilled workers.

---

[3]  In this regard, the source selection document noted that the TEP had concluded that for:

- Chicago:           There would be marginal additional benefit
                     by awarding to NEQ.
- Detroit:           No additional benefit with any offeror.
- Minneapolis:       There would be significant benefit awarding to LATA-
                     KEMRON.
- Cleveland:         None of the three contractors has presence directly in
                     Cleveland.
- East St. Louis:    There would be significant benefit awarding to LATA-
                     KEMRON.
- Cincinnati:        Even with questioning the numbers provided, there would
                     be significant benefit awarding to NEQ.
- Milwaukee:         No additional benefit with any offeror.
- Indianapolis:      There would be significant benefit awarding to LEEDI.
- Columbus, OH:      There would be significant benefit awarding to LATA-
                     KEMRON.

Based upon the offeror's final proposal revisions, L-K's total evaluated price of $105,149,346.00 exceeded NEQ's price of $102,960,441.00, by $2,188,905, a difference of about 2.2 percent. Despite this, the agency awarded the contract to L-K for a third time, concluding that "awarding to LATA-Kemron would provide the greatest overall benefit to the Government." Explaining its decision, the agency compared L-K's bid with that of NEQ stating, in part:

> The most notable technical differences between these two proposals were under Factor 2, Response Capability, where LATA-KEMRON received higher scores (4 versus 3) for both subfactors. The LATA-KEMRON team (prime contractor and its team subcontractors) offered a direct presence in seven of the nine emergency response metro areas, while the NEQ team offered a direct presence in three of those areas. In addition to an enhanced response network, LATA-KEMRON also demonstrated better response experience. Moreover, LATA-KEMRON offered a more realistic labor mix than NEQ, whose proposal demonstrated a heavy reliance upon EQM personnel.

Ultimately, the agency concluded that while L-K's "evaluated price is approximately 2 percent higher than NEQ's evaluated price," "[t]his slight evaluated price premium is a reasonable trade-off for the benefits of the decentralized response network, better response experience, and more balanced labor mix offered by LATA-KEMRON." It thus decided that "in accordance with FAR 15.101(c), LATA-KEMRON represents a better value for the agency when compared to NEQ."

NEQ filed a third protest with the GAO, which it voluntarily dismissed on February 19, 2009, in favor of filing suit in this court. That suit was filed on March 3, 2009. On March 31, 2009, plaintiff filed its motion for judgment on the administrative record. On April 17, 2009, defendant and the defendant-intervenor filed their cross-motions for judgment on the administrative record. After briefing on the motions was completed, oral argument on the cross-motions was conducted on May 22, 2009.

## II.    DISCUSSION

Before turning to plaintiff's claims, we begin with common ground.

### A.    Standard of Review

The Federal Circuit, in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005), instructed that courts must "distinguish . . . [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact." Toward this end, *Bannum* teaches that two principles commonly associated with summary judgment motions – that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party – do not apply in deciding a motion for judgment on the administrative record. *Id.* at 1356-57. The existence of a question of fact thus neither precludes the granting of a motion for judgment on the

administrative record nor requires this court to conduct a full blown evidentiary proceeding. *Id.*; *see also Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 45-46 (2005).[4] Rather, such questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [the Court of Federal Claims] were conducting a trial on [that] record." *Bannum*, 404 F.3d at 1357; *see also Int'l Outsourcing*, 69 Fed. Cl. at 46; *Carlisle v. United States*, 66 Fed. Cl. 627, 631 (2005); *Doe v. United States*, 66 Fed. Cl. 165, 174-75 (2005), *aff'd*, 221 Fed. Appx. 994 (Fed. Cir. 2007).[5]

*Bannum*'s approach to deciding motions for judgment on the administrative record evinces the limited nature of the review conducted in bid protests. In such cases, this court will enjoin defendant only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2006); *see also* 28 U.S.C. § 1491(b)(4) (2006). By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 538 (2003); *Gulf Group, Inc. v. United States*, 56 Fed. Cl. 391, 396 n.7 (2003). As the focus of this standard is more on the reasonableness of the agency's result than on its correctness, the

---

[4]  *Bannum* was based upon RCFC 56.1, which, in 2006, was abrogated and replaced by RCFC 52.1. The latter rule was designed to incorporate the decision in *Bannum*. *See* RCFC 52.1, Rules Committee Note (June 20, 2006); *see also NVT Techs., Inc. v. United States*, 73 Fed. Cl. 459, 462 n.3 (2006); *Bice v. United States*, 72 Fed. Cl. 432, 441 (2006).

[5]  In *Bannum*, the Federal Circuit noted that, in *Banknote Corp. of Am. Inc. v. United States*, 365 F.3d 1345, 1352-53 (Fed. Cir. 2004), it had erroneously conflated the standards under RCFC 56 and 56.1, albeit in *dicta*. In this regard, the *Bannum* court stated that –

> Although it never reached the factual question of prejudice, the *Banknote II* court added that it is the trial and appellate courts' task to "determine whether there are any genuine issues of material fact as to whether the agency decision lacked a rational basis or involved a prejudicial violation of applicable statutes or regulations." This language equates a RCFC 56.1 judgment to a summary judgment under RCFC 56 and is unnecessary to the *Banknote II* holding. Because the court decided the issue by an interpretation of the solicitation, *e.g.*, making a legal determination, the court in *Banknote II* did not need to consider whether the trial court overlooked a genuine dispute or improperly considered the facts of that case.

*Bannum*, 404 F.3d at 1354. Prior decisions of this court have made the same error. *See*, *e.g.*, *JWK Int'l Corp. v. United States*, 49 Fed. Cl. 371, 387 (2001), *aff'd*, 279 F.3d 985 (Fed. Cir. 2002).

court, to apply this standard properly, must exercise substantial restraint in examining information that was not available to the agency. Failing to do so, the Federal Circuit recently observed, risks converting arbitrary and capricious review into a subtle form of *de novo* review. *See Axiom Resources Management, Inc. v. United States*, 564 F.3d 1374, 1379-80 (Fed. Cir. 2009).[6] At all events, this court will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (quoting *United States v. John C. Grimberg Co., Inc.*, 702 F.3d 1362, 1372 (Fed. Cir. 1983)). Indeed, a "protester's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a 'best-value' procurement." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).[7]

The aggrieved bidder must demonstrate that the challenged agency decision is either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp.*, 365 F.3d at 1351, *aff'g*, 56 Fed. Cl. 377, 380 (2003); *see also ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 201 (2007). Moreover, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).

---

[6]  In *Axiom*, the Federal Circuit noted that the "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" 564 F.3d at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)). In particular, the Federal Circuit rejected the expansive approach to the use of extra-record evidence advocated in *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), noting that: (i) *Esch* "departs from fundamental principles of administrative law as articulated by the Supreme Court;" (ii) its "vitality even within the D.C. Circuit is questionable in light of more recent opinions by that court which demonstrate a more restrictive approach to extra-record evidence;" and (iii) *Esch* "is not the law of this circuit." *Axiom*, 564 F.3d at 1380-81. While *Axiom* undoubtedly permits limited supplementation of the record with evidence that does not involve the agency's procurement decision (*e.g.*, evidence as to whether a plaintiff would experience irreparable harm), it makes clear that any court in this circuit that relies upon *Esch* to supplement the administrative record more broadly does so at peril of reversal.

[7]  As noted by the Federal Circuit, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed. Cir. 1995) (citing *Burroughs Corp. v. United States*, 617 F.2d 590, 597-98 (Ct. Cl. 1980)); *EP Prod'ns., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005), *aff'd*, 163 Fed. Appx. 892 (Fed. Cir. 2006).

Finally, because injunctive relief is relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear.  *See Banknote Corp.*, 56 Fed. Cl. at 380-81; *Seattle Sec. Servs. v. United States, Inc.*, 45 Fed. Cl. 560, 566 (2000).

## B.      Alleged Errors in the Evaluation Approach

It is with this basic analytical framework in mind that we now turn to the specific allegations of error here.

### (1)      Unstated Evaluation Criteria

Plaintiff's banner claim is that the EPA relied upon an unstated evaluation criterion in rating the proposals here.  It is "hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."  *Banknote Corp.*, 56 Fed. Cl. at 386; *see also PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004).  This requirement is firmly rooted in the Competition in Contracting Act (CICA), which indicates that an agency shall evaluate competitive proposals and assess their qualities based solely on the factors and subfactors specified in the solicitation.  *See* 10 U.S.C. §§ 2305(a)(2)(A), 2305(a)(3)(A); 48 C.F.R. § 15.305(a).   It thus is beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluating proposals, *Acra, Inc. v. United States*, 44 Fed. Cl. 288, 293 (1999), and, where appropriate, must disclose the factor's relative importance, *Isratex, Inc. v. United States*, 25 Cl. Ct. 223, 230 (1992).  *See also Banknote*, 56 Fed. Cl. at 386; *Cube Corp. v. United States*, 46 Fed. Cl. 368, 377 (2000); *Dubinsky v. United States*, 43 Fed. Cl. 243, 266 (1999).

That said, an agency still has "great discretion in determining the scope of an evaluation factor."  *Forestry Surveys and Data v. United States*, 44 Fed. Cl. 493, 499 (1999) (citing John Cibinic Jr. & Ralph C. Nash Jr. (Cibinic & Nash), Formation of Government Contracts 830 (3rd ed. 1998)).  In particular, "it is well-settled that 'a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors.'" *Banknote Corp.*, 56 Fed. Cl. at 387 (quoting *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 45 (1997)); *see also Academy Facilities Mgmt. v. United States*, 2009 WL 1808445 at * 31 (Fed. Cl. June 5, 2009); *OTI Am., Inc. v. United States*, 73 Fed. Cl. 758, 773 (2006); *Comprehensive Health Servs., Inc. v. United States*, 70 Fed. Cl. 700, 724 (2006).  Hewing to these precedents, to prevail on an argument that an agency used an unstated evaluation criterion, a protester must show that: (i) "the procuring agency used a significantly different basis in evaluating the proposals than was disclosed; and (ii) the protester was prejudiced as a result – that it had a substantial chance to receive the contract award but for that error." *Banknote Corp.*, 56 Fed. Cl. at 387.[8]  Plaintiff has failed on both counts.

---

[8]   *See PHT Supply Corp. v. United States*, 71 Fed. Cl. 1, 14 (2006); *Bean Stuyvesant v. United States*, 48 Fed. Cl. 303, 321 (2000); *ITT Federal Services Corp. v. United States*, 45 Fed. Cl. 174, 178 (1999); *Hydro Eng'g, Inc. v. United States*, 37 Fed. Cl. 448, 471 (1997); *CACI Field Servs., Inc. v. United States*, 13 Cl. Ct. 718, 728 (1987), *aff'd*, 854 F.2d 464 (Fed. Cir. 1988).

Contrary to plaintiff's claims, it is readily apparent, in looking at the RFP as a whole, that metropolitan presence would be weighed in considering the merits of a technical proposal. First, as plaintiff admits, the RFP singled out, by name, nine large metropolitan areas in which the response time had to be no more than four hours. The RFP required that offerors demonstrate how these response times would be met, requiring them to include, in their technical proposals, charts and maps that revealed the location of their personnel. The combination of these requirements reasonably should have alerted the offerors to the agency's intention to consider metropolitan presence in rating an offeror's technical proposal. *See Maintenance Eng's v. United States*, 50 Fed. Cl. 399, 416 (2001); *see also* Cibinic & Nash, *supra* at 830 ("[w]hen weighing the merits of a proposal under a specific evaluation factor, an agency 'may consider all matters that offerors would reasonably have believed to be within the scope of the factor.'" (citations omitted)). Indeed, despite its contentions to the contrary, NEQ's own proposal included a chart that listed the types of personnel available "[w]ithin 4 Hours of Response Cities" and a map that highlighted with yellow dots the nine "SOW locations" and used various other graphics to depict how its offices intersected these locations. Ironically, then, it appears that plaintiff well understood that which it claims was incomprehensible, *to wit*, that, under the RFP, it was important to have a metropolitan presence in or near the nine cities specifically enumerated in the SOW.

Moreover, despite plaintiff's claims to the contrary, it was also reasonably apparent from the RFP that those who had a greater metropolitan presence and could offer quicker response times than the minimums specified would receive higher ratings. In the segment describing its rating system, the RFP plainly disclosed that proposals that reflected "the possibility of more than adequate performance" would be rated higher. That is exactly how the agency rated the Response Network subfactor. And there is no indication that this application of the rating system was arbitrary or capricious. *See PGBA*, 60 Fed. Cl. at 210 ("consideration of commitments to exceed minimum requirements by providing additional benefit to the government lies at the heart of the [exceptional] rating"); *Banknote Corp.*, 56 Fed. Cl. at 387 (no undisclosed evaluation factor where higher rating attributable to offeror exceeding requirements).

That EPA would focus on metropolitan presence in evaluating and rating the proposals thus was plainly revealed in the RFP. And even were there room for debate on that count, there can be no bandying that an evaluator seeking the quickest response times for emergencies in large cities could be expected to review the responders' proximity thereto. At the least, then, the latter consideration was intrinsic to the stated evaluation factors – which is enough to satisfy the disclosure requirements of the FAR. *See Comprehensive Health Serv.*, 70 Fed. Cl. at 724 (agency need not identify each element intrinsic to an announced evaluation factor); *Gulf Group*, 56 Fed. Cl. at 398 (same). In short, for one reason or another, the agency's focus on metropolitan presence did not amount to the use of an unstated evaluation factor.

To cinch matters, NEQ has failed to explain, in even the most general detail, how it would have changed its proposal had it "understood" that proximity to metropolitan areas was relevant and important. Plaintiff, of course, unhesitatingly claims that had it understood this, it would have stationed personnel in the various cities in which it lacked a metropolitan presence or

-13-

bolstered its personnel in the cities where it had a limited presence. And it would have done so, plaintiff asseverates, even if that meant charging a higher price, provided the end result was obtaining an award here. But, of course, the aplomb with which plaintiff makes these representations comes from perfect 20-20 hindsight. In fact, plaintiff had no way of knowing how its price compared to that of its competitors at the time it was formulating its staffing proposal and thus no way to know what effect increasing its price would have. Without that knowledge, there is no reason to believe that, had the importance of metropolitan presence been highlighted more in the RFP – at least to the extent that would satisfy plaintiff –  NEQ would have submitted anything significantly different in terms of a staffing plan. And that leaves it ill-positioned to argue now that it was prejudiced by an unstated evaluation factor – a factor, of course, that the court believes was quite explicit.

　　　Nor is there any indication that defendant acted in an arbitrary and capricious fashion either in adopting metropolitan presence as a criterion or in evaluating the proposals in this regard. Plaintiff's criticisms are considerably overblown and, at times, rely upon factual premises that are not borne out by the record. For example, plaintiff contends that it was irrational for EPA to favor having emergency responders located near large metropolitan areas because of the possibility that emergencies at those locations would impact the responders. But, this is far from apparent. And, at any rate, EPA had a different view, believing that such proximity translated into quicker response times and that quicker response times meant – in the words of the source selection documents – "less impact on human health and the environment." While plaintiff might disagree, it requires more than its disagreement to demonstrate arbitrariness. *See Che Consulting, Inc. v. United States*, 74 Fed. Cl. 742, 747 (2006) ("An agency's determination of the 'best method of accommodating' its needs . . . falls within the agency's discretion." (quoting *United Enter. & Assocs. v. United States*, 70 Fed. Cl. 1, 26 (2006)); *see also Wit Assocs., Inc. v. United States*, 62 Fed. Cl. 657, 662 (2004). Likewise off the mark is plaintiff's claim that the EPA arbitrarily gave L-K credit for having a metropolitan presence in cities in which it had insufficient staffing. In fact, as the chart contained in the third source selection document well illustrates, for the three cities in which L-K was deemed to have an advantage over its competitors – Minneapolis, East St. Louis and Columbus – it had 48, 103 and 53 personnel available, respectively.[9]  These numbers hardly reflect skeletal staffing levels. While plaintiff again vigorously disagrees with the agency's assessment of the adequacy of these resources, "[s]uch naked claims," this court has oft-stated, "by all appearances unsupported by

_____

　　　[9] On brief, plaintiff asserts that the TEP "gave credit to an offeror for having a direct 'metropolitan presence' even though that 'presence' consisted of having merely one laborer in the area." But, the "offeror" cited by plaintiff was not L-K, but LEEDI. Accordingly, plaintiff can claim no prejudice as to this finding. Indeed, a review of the record strongly suggests that the agency improperly credited NEQ with having a personnel advantage in Cincinnati. The chart used by the TEP in making this finding indicated that NEQ had 34 response managers, 23 equipment operators and 57 laborers, while the exhibit submitted by NEQ with its proposal listed for that city only 6 or 7 response managers, 6 equipment operators, and 21 laborers – staffing that was less than what L-K had at this location.

anything in the record, fall far short of meeting the heavy burden of demonstrating that these findings were the product of an irrational process and hence arbitrary and capricious." *JWK Int'l*, 52 Fed. Cl. at 660; *see also EP Prod'ns,* 63 Fed. Cl. at 226; *Banknote Corp.*, 56 Fed. Cl. at 384. Again, the court finds no shred of an error here.

### (2)      Other Assertions of Error

In the remainder of its briefs, plaintiff makes a number of other assertions of error.

For example, plaintiff asserts that, in its review of subfactor 2b, the agency improperly listed as a strength in L-K's proposal its "working relationship" with three specialty subcontractors, "which could provide highly specialized expertise in the event of certain types of emergency responses."  On brief, plaintiff boldly asserts that L-K "simply listed the names" of these subcontractors and should not have received credit for naming them in its proposal.  The administrative record, however, says otherwise.  It reveals that in the relevant sections of its proposal, L-K not only described in detail the work the subcontractors had performed on other EPA ERRS matters, but also specifically indicated that one of the affected subcontractors (IES) "had supported [it] on its Region 4 ERRS contract," and that another (CMC) had worked with Kemron on other EPA ERRS contracts.  And while L-K's proposal does not list specific projects on which it had worked with the third specialty subcontractor (KCSI) involved, it recounted detailed information that plainly suggests that it had made contact with that subcontractor – a claim that the agency could reasonably believe given that Kemron, one of the partners in the L-K joint venture, had been the incumbent on four EPA ERRS contracts for EPA Regions 3 and 4. Moreover, the L-K proposal represented that "[e]ach subcontractor has assigned a [point of contact] to commit the resources of their representative firms."  In the court's view, the information supplied by L-K reasonably allowed the EPA to conclude that it had "working relationships" with the subcontractors.  Certainly, these were not, as plaintiff's counsel seemed to intimate at oral argument, names plucked from a phone book.

Plaintiff also complains that L-K failed to provide notices of intent for its specialty subcontractors.  It claims that this was required by clause L.16(III)(D) of the RFP, which stated:

### D.  Subcontracts

Identify subcontractors or team subcontractors.  The offeror shall submit notices of intent with their proposal.  The successful offeror shall provide within five (5) calendar days of issuance of a notice of award, one copy of each proposed Team Subcontract agreement (when applicable).

Plaintiff contends that the requirement for submission of notices of intent applies to specialty subcontractors and "was a mandatory requirement of the Solicitation."  But, it is unclear whether the notice requirement applied to "specialty subcontractors" or only the "team subcontractors" envisioned under the RFP.  Unlike specialty subcontractors, who were used for highly specific clean-up operations (*e.g*, recovering buried gas cylinders), team contractors had a broader role in

the performance of the contract and, indeed, were subject to numerous requirements within the RFP, including the requirement for filing agreements mentioned above. None of those other requirements applied to the specialty subcontractors. That the offerors, indeed, did not believe that the "notice of intent" requirement applied to "specialty subcontractors" is perhaps best evidenced by the fact that, like its competitors, ***plaintiff*** did not provide such notices either. Plaintiff thus "is hoisted on the petards of its own interpretation of the relevant provision – further indication, of course, that its interpretation is wrong." *Arko Exec. Serv. Inc. v. United States*, 78 Fed. Cl. 420, 426 (2007). Moreover, given the significant information provided by L-K regarding its specialty subcontractors, as well as the EPA's familiarity with L-K's performance of other ERRS contracts, the EPA cannot be said to have acted unreasonably in concluding that the specialty subcontractors, who had worked on other EPA matters, would be available to perform under the Region 5 contract. At all events, the EPA would have been hard pressed to treat L-K's failure to provide such notices as disqualifying, given the need for clarity normally associated with mandatory minimum requirements.[10]

Finally, plaintiff attempts to assault, on various grounds, the agency's tradeoff decision. It contends first that the agency should not have used the "total offer price," in making that comparison, but rather should have compared various components of those prices (comparisons, it asserts, that would have made its case more compelling). In making that claim, however, plaintiff erroneously cites the portion of the RFP dealing with a price reasonableness analysis. In section M of the RFP, where the relevant language is actually found, the EPA made amply clear that "the Government will evaluate offers for award purposes by adding the total price for all terms to the total price for the basic requirements." And this is precisely what the agency did here. Moreover, while plaintiff suggests that the trade-off discussion here contains the sort of "conclusory statements, devoid of any substantive content" that have been found lacking in other cases, *see Serco, Inc. v. United States*, 81 Fed. Cl. 463, 497 (2008), that is not the case. Rather than summarily concluding that a premium should be paid, the trade-off discussion here ran a half dozen pages, exhaustively relying on the charts and statistics recounted in the background segment above. That plaintiff disagrees with the agency's rationale for concluding that L-K's technical strengths – which included not only the potential for faster response times, but its more significant experience with ERRS contracts and labor mix – warranted paying a $2.2 million price premium is, of course, quite irrelevant. Rather, this court's role is to "ensure that the contracting officer examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" *Banknote*, 56 Fed. Cl. at 390 (quoting *Motor Vehicle Mfrs.*

---

[10]   Absent a more specific instruction in this regard and a warning of potential disqualification, treating this language as establishing a mandatory minimum requirement likely would violate fundamental principles of federal procurement policy. *See Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed. Cir. 1998); *Banknote Corp.*, 56 Fed. Cl. at 382; *ManTech Telecomms.*, 49 Fed. Cl. at 67. And, it should not escape notice that if L-K's proposal should have been downgraded to reflect its failure to produce such notices, plaintiff's proposal would have been downgraded on that basis, as well. *See Medical Matrix, LLP v. United States*, 2007 WL 5161789 at *6 n.15 (Fed. Cl. Dec. 12, 2007).

*Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).  And, on this record, the court is satisfied that these requirements were met here.[11]

Plaintiff raises at least a half dozen other grounds for overturning the award here, most of which are glancing blows, some of which rely upon further factual misstatements or selective readings of the record – all of which, in the end, are unpersuasive.  The court will not discuss these further.

### C.      Injunctive Relief

Even had plaintiff demonstrated that the instant procurement was legally flawed and that it was thereby prejudiced, it would not be entitled to the relief requested unless it further showed that: (i) it would suffer immediate and irreparable injury; (ii) the public interest would be better served by the relief requested; and (iii) the balance of hardships on all the parties favors them. *See Serco*, 81 Fed. Cl. at 501; *Bannum, Inc. v. United States*, 60 Fed. Cl. 718, 730 (2004); *see also Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983).  Plaintiff has made utterly no such showing – indeed, its briefing is devoid of any discussion of these injunctive factors.

Seeking to explain away this glaring void in its presentation, plaintiff contends that it is not seeking an "injunction" here, but merely seeks a ruling requiring the agency to reevaluate the existing proposals in light of the requirements it believes were actually contained in the RFP. This claim, of course, is somewhat suspect for, presumably, if a reevaluation showed that its proposal was the best value, plaintiff would also want to perform this contract instead of L-K. But, even taking plaintiff at its word, the relief it is now requesting is clearly in the nature of an injunction and thus requires the multi-pronged showing that plaintiff has not provided.  *See Aberdeen & Rockfish R. Co. v. Students Challenging Regulatory Agency Proceedings*, 422 U.S. 289, 307 (1975) (order requiring an agency "to perform certain acts" was "plainly cast in injunctive terms"); *Int'l Longshoremen's Ass'n Local 1291 v. Phil. Marine Trade Ass'n*, 389 U.S. 64, 75 (1967) (defining an injunction broadly as "an equitable decree compelling obedience under the threat of contempt"); *see also Ulstein Maritime Ltd. v. United States*, 833 F.2d 1052,

----

[11]   Seeking to bolster its various arguments, plaintiff argues that metropolitan presence was "no[t] mention[ed] whatsoever" until this third evaluation.  That is not true.  This issue, in fact, was focused upon in both the competitive range determination (at Ex. 6, p. 001948) and in both the first and second source selection documents.  Plaintiff also assails the portion of the trade-off discussion which notes that L-K's more significant metropolitan presence would reduce per diem costs.  Again, plaintiff challenges this finding with factual representations not found in the record (*e.g.*, that the individuals responding to an emergency might not be those located in the surrounding metropolitan area).  But, the court will not, without more, second guess the agency's findings, particularly since the source selection decisions actually cite an example in which lower per diem costs might have been incurred had L-K previously been performing the contract.

1055 (1st Cir. 1987) (applying a similar definition in a government contract case).  At bottom, then, plaintiff has not met the requirements for the relief it seeks.[12]

## III.   CONCLUSION

The court need go no further.  Measured by the appropriate standard of review, the EPA's award decision here is not arbitrary, capricious or otherwise contrary to law.  The relief requested by plaintiff, hence, is not appropriately granted.

In consideration of the above:

1.      Plaintiff's motion for judgment on the administrative record is **DENIED**, and defendant's and defendant intervenor's cross-motions for judgment on the administrative record are **GRANTED**.  The Clerk is ordered to dismiss the complaint.

2.      This opinion shall be published as issued after August 7, 2009, unless the parties identify protected and/or privileged materials subject to redaction prior to said date.  Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction.

**IT IS SO ORDERED**.


                                        s/ Francis M. Allegra
                                        Francis M. Allegra
                                        Judge

---

[12]  Plaintiff's counsel sought to address the other injunctive factors for the first time at oral argument.  The court declined to allow him to do so, particularly since the other counsel involved indicated that they would have requested an opportunity to respond to plaintiff's arguments in writing.